# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 9, 2006          Decided July 7, 2006

No. 05-5143

CHAPLAINCY OF FULL GOSPEL CHURCHES, ET AL.,
APPELLANTS

v.

GORDON R. ENGLAND, SECRETARY OF THE U.S. NAVY, ET AL.,
APPELLEES

Consolidated with
05-5144

Appeals from the United States District Court
for the District of Columbia
(No. 00cv00566)
(No. 99cv02945)

*Arthur A. Schulcz, Sr.* argued the cause and filed the briefs
for appellants.

*Robert M. Loeb*, Attorney, U.S. Department of Justice,
argued the cause for appellees. With him on the brief were *Peter
D. Keisler*, Assistant Attorney General, *Kenneth L. Wainstein*,
U.S. Attorney, and *I. Glenn Cohen*, Attorney.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*: Appellants, current and former Navy chaplains of "non-liturgical Protestant" faiths and their endorsing agency, brought suit alleging the Navy has unconstitutionally established and maintained a religious quota system for the promotion, assignment, and retention of Navy chaplains that disadvantages chaplains of non-liturgical Protestant faiths. In the midst of discovery, Appellants moved for preliminary and structural injunctions and for partial summary judgment. The district court denied the motion in its entirety, finding, in particular, that Appellants had failed to demonstrate the irreparable injury necessary to warrant preliminary injunctive relief. We affirm the district court as to its denial of a structural injunction, and we have no jurisdiction to review its denial of partial summary judgment; however, because we conclude Appellants have satisfied the requisite showing of irreparable harm for an Establishment Clause violation, we vacate the district court's judgment denying preliminary injunctive relief and remand for the district court to proceed with the remainder of the preliminary injunction determination.

I

The United States Navy maintains a Chaplain Corps to "meet the spiritual needs of those who serve in the Navy and their families." *Adair v. England*, 183 F. Supp. 2d 31, 35 (D.D.C. 2002) (citation and internal quotation mark omitted). Chaplains serve as Naval officers and, like other military officers, both regular and reserve, receive periodic reviews by promotion selection boards that determine which officers should

be recommended for promotion. *Id.* at 35-36; 10 U.S.C. §§ 611, 14101. Any officer a promotion selection board considers but does not recommend for promotion is deemed to have "failed of selection" (FOS) to the higher grade. 10 U.S.C. §§ 627, 14051. The military may convene a special selection board for officers who were erroneously not considered by a promotion selection board, or who were considered but did not receive lawful or proper consideration. *Id.* §§ 628, 14502; SECNAV Instruction 1401.1B, Special Promotion Selection Boards for Commissioned and Warrant Officers in the Navy and Marine Corps ¶ 4(b) (Dep't of the Navy Apr. 25, 1997).

Federal law mandates separation from military service based on criteria relating to age, grade, and failures of selection. In general, naval reserve officers who have not been recommended for promotion to the grade of rear admiral (lower half) must be separated from the military on the last day of the month they reach 60 years of age.[1] 10 U.S.C. § 14509. The Secretary of the Navy is afforded some flexibility to deviate from this rule, however. Provided a reserve officer in the Chaplain Corps has not twice failed to be promoted to the next higher grade, the Secretary may retain the chaplain until age 67. *Id.* § 14703(a)(2). Ordinarily, a second FOS makes separation mandatory, *e.g.*, *id.* §§ 14505-14506, but even officers who would otherwise be precluded from further service for having twice failed of selection may, "subject to the needs of the service," be considered for continuation under regulations prescribed by the Secretary of Defense, *id.* § 14701(a)(1); SECNAV Instruction 1920.7B, Continuation on Active Duty of Regular Commissioned Officers and Reserve Officers on the

---

[1] As pertinent to this appeal, the grades of lieutenant and lieutenant commander are both below the grade of rear admiral (lower half). 10 U.S.C. § 5501.

Reserve Active Status List (RASL) in the Navy and Marine Corps (Dep't of the Navy Jan. 30, 2006); DoD Directive 1320.8, Continuation of Regular Commissioned Officers on Active Duty and Reserve Commissioned Officers on the Reserve Active Status List (Dep't of Defense Oct. 21, 1996).[2] Chaplains retained under this continuation exception may also serve until age 67. SECNAV Instruction 1920.7B ¶ 8; DoD Directive 1320.8 ¶ 4.9.

The Secretary of the Navy has issued instructions describing the qualifications for eligibility as a Chaplain Corps officer. "To be eligible for appointment . . . in either the active-duty or Reserve components, or for voluntary recall from the Reserve component to the active-duty list," an applicant must, among other requirements, "be able to complete 20 years of active commissioned service by age 60," a benchmark that may be raised to age 62 in certain instances. SECNAV Instruction 1120.4, Appointment of Regular and Reserve Officers in the Chaplain Corps of the Navy ¶ 6(b) (Dep't of the Navy May 14, 1986). Applicants who will be unable to complete 20 years of active commissioned service by age 60 must, before their appointment, acknowledge in writing that they are ineligible for appointment to regular service. *Id.* ¶ 6. In addition, applicants who will be unable to complete 20 years of creditable service for

---

[2] Prior to 2003, both regular and reserve officers who twice failed of selection were considered for continuation by a selection board convened expressly for that purpose. 10 U.S.C. §§ 637(a)(1), 14701(a)(1) (2000); *id.* §§ 611(b), 14101(b)(1). In 2003, in an effort to "streamline[]" the process for continuation of reserve officers, Congress repealed the selection board requirement as to reserve officers. National Defense Authorization Act for Fiscal Year 2004, Pub. L. No. 108-136, § 511, 117 Stat. 1392, 1459.

retirement must similarly acknowledge the same in writing. *Id.*

The Navy divides its chaplains into four categories according to common faith group characteristics: Catholic, liturgical Protestant, non-liturgical Protestant, and "special worship." "Liturgical Protestant" refers to Protestant denominations that trace their origins to the Reformation, retain an established liturgy in their worship services, and practice infant baptism; it includes Lutheran, Episcopal, Methodist, Presbyterian, and Congregational faiths. *Adair*, 183 F. Supp. 2d at 36. "Non-liturgical Protestant" refers to Protestant denominations that do not have a formal liturgy or order in their worship services, that baptize only those who have reached the age of reason, and whose clergy generally do not wear religious vestments during services; it includes Baptist, Evangelical, Pentecostal, and Charismatic faiths. *Id.*; *see also In re England*, 375 F.3d 1169, 1172 (D.C. Cir. 2004).[3]

Plaintiffs-Appellants are a group of current and former Navy chaplains of non-liturgical Protestant faiths and their recognized endorsing agency, the Chaplaincy of Full Gospel Churches.[4] They filed two separate suits against the Secretary of the Navy and other Navy personnel in their official capacities and the Navy itself, Appellees here. In both actions, Appellants alleged

---

[3] "Special worship" refers to faith groups, both Christian and non-Christian, that have "unique or special needs for their worship and religious practices"; it includes Jewish, Christian Science, Seventh-Day Adventist, Mormon, Buddhist, Hindu, Moslem, Jehovah's Witness, and Unitarian faiths. *Adair*, 183 F. Supp. 2d at 36. It is not a relevant category to the instant proceeding.

[4] To be eligible for appointment in the Chaplain Corps, an applicant must receive the endorsement of a recognized ecclesiastical endorsing agency. SECNAV Instruction 1120.4, at ¶ 7(b).

"the Navy has established, promoted, and maintained religious quotas and other discriminatory practices in the Navy Chaplain Corps in violation of the First and Fifth Amendments," *In re England*, 375 F.3d at 1174, and these practices work to the detriment of non-liturgical Christian chaplains.  In 2000, the district court consolidated the two cases for the purpose of addressing and resolving pretrial motions.  Mem. Op. Den. the Pls.' Mot. for Prelim. and Structural Inj.; Den. the Pls.' Mot. for Partial Summ. J. Without Prejudice 2 n.2 (Feb. 7, 2005) (Mem. Op.).  A prolonged series of motions and petitions followed. *See, e.g.*, *Adair v. England*, 417 F. Supp. 2d 1 (D.D.C. 2006); *Chaplaincy of Full Gospel Churches v. England*, 221 F.R.D. 255 (D.D.C. 2004); *Chaplaincy of Full Gospel Churches v. Johnson*, 217 F.R.D. 250 (D.D.C. 2003), *rev'd*, *In re England*, 375 F.3d at 1169, *cert. denied*, 125 S. Ct. 1343 (2005); *Chaplaincy of Full Gospel Churches v. Johnson*, 276 F. Supp. 2d 82 (D.D.C. 2003); *Chaplaincy of Full Gospel Churches v. Johnson*, 276 F. Supp. 2d 79 (D.D.C. 2003); *Adair v. Johnson*, 216 F.R.D. 183 (D.D.C. 2003); *Adair v. England*, 217 F. Supp. 2d 7 (D.D.C. 2002); *Adair v. England*, 209 F.R.D. 5 (D.D.C. 2002); *Adair v. England*, 209 F.R.D. 1 (D.D.C. 2002); *Adair v. England*, 217 F. Supp. 2d 1 (D.D.C. 2002); *Adair v. England*, 193 F. Supp. 2d 196 (D.D.C. 2002); *Adair*, 183 F. Supp. 2d at 31; *see also* Mem. Op. at 2 (describing the case's "wearisome, piecemeal litigation").

The instant appeal stems from the district court's denial of Appellants' latest motion, filed in the midst of discovery.  Appellants' Interrogatory No. 9 requested a list of chaplains on active duty over age 62 and their denominations.  From the Navy's response, Appellants identified fifteen Catholic reserve chaplains over age 62, fourteen of whom are lieutenants or lieutenant commanders who have twice failed of selection and yet remain on active duty.  Mem. of P. & A. in Supp. of Pls.'

Mot. for a Prelim. and Structural Inj. and Partial Summ. J. 8 (June 5, 2003) (Pls.' Mem.); Appellants' Br. 11. Appellants also identified seven of these FOS Catholic chaplains as age 67 or greater. Pls.' Mem. at 8.

Armed with this evidence, Appellants moved for preliminary and structural injunctions and partial summary judgment. Appellants contended the age 60 ceiling established by 10 U.S.C. § 14509 prohibits the Navy from allowing the identified reserve lieutenant and lieutenant commander chaplains over age 62 to remain on active duty. *Id.* Even if the chaplains remained in service past age 60 under 10 U.S.C. § 14703, Appellants argued, the Navy violated that provision's absolute age limit of 67 by retaining seven chaplains of or over that age. *Id.* Appellants also maintained that none of the chaplains over age 62 possessed sufficient time in service to qualify for retirement and the resulting pension, *id.*, and that the Navy gave those chaplains over age 67 a "4109" personnel classification, meaning "retired reservist recalled to active duty," even though none of them possessed the requisite time in service to qualify for retirement and for the Navy legally to recall them. *Id.* at 9.[5]

The Navy's actions, in Appellants' words, evidence a "well established practice of allowing Catholic Naval Reserve chaplains, and only Catholic chaplains," to remain on active duty beyond mandatory separation age limits, constituting "religious favoritism" in violation of the Establishment Clause. *Id.* at 1-2.

---

[5] Appellants also claimed that even if the seven "4109" chaplains over age 67 met the requirements for retirement and thus could legally be recalled to active duty, the duration of their recalls exceeded the 180-day time limit set by Navy regulations. Pls.' Mem. at 9; SECNAV Instruction 1811.4E, Voluntary Recall/Retention of Retired Officers to/on Active Duty ¶ 4(c) (Dep't of the Navy June 24, 1993).

Appellants also accused the Navy of "fraud in covering up this illegal retention" by wrongfully employing the "4109" classification with respect to Catholic chaplains over age 67. *Id.* at 1. The Navy's "scheme," according to Appellants, "appears on its face to have no other purpose but to allow these over-age chaplains to illegally qualify for retirement." *Id.* Appellants sought relief that would, among other things, "require the Navy to separate immediately those chaplains it has allowed to continue on active duty beyond age 60." *Id.* at 22.

The district court denied the motion in its entirety. The district court first rejected preliminary injunctive relief because Appellants failed to demonstrate any irreparable injury. Mem. Op. at 5. In so doing, it repudiated Appellants' argument that violation of the law, including the First Amendment and, specifically, the Establishment Clause, per se constitutes irreparable harm. *Id.* at 6-7. The district court then denied partial summary judgment because adequate time for discovery had not passed. *Id.* at 8. Appellants timely appealed.

## II

We begin on a brief jurisdictional note. We have jurisdiction to review the district court's denial of preliminary injunctive relief, *see* 28 U.S.C. § 1292(a)(1); however, as a general rule, we lack jurisdiction to hear an appeal of a district court's denial of summary judgment, partial or otherwise. *E.g.*, *Johnson v. Greater Se. Comm. Hosp. Corp.*, 951 F.2d 1268, 1277 (D.C. Cir. 1991). Appellants offer no reasons to deviate from this principle, so we confine the remainder of our analysis to the district court's denial of the requested preliminary injunction.[6]

---

[6] Appellants also moved for a structural injunction, a remedy that has been defined as an "injunction seeking to effect the reform of a

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). It is "an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To warrant preliminary injunctive relief, the moving party must show (1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction. *E.g.*, *Mova Pharm. Corp.*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (quoting *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)) (internal quotation marks omitted). A district court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed*, 58 F.3d at 747. If the showing in one

---

social institution." Owen M. Fiss, *The Civil Rights Injunction* 9 (1978). The purpose of a structural injunction is "to remodel an existing social or political institution to bring it into conformity with constitutional demands; e.g., restructuring a school system to facilitate equal educational opportunities." *Lampkin v. District of Columbia*, 886 F. Supp. 56, 62 (D.D.C. 1995). Structural injunctions are "typically used as public law remedies for serious and pervasive rights violations." *Id.* The district court never specifically addressed Appellants' request for a structural injunction, concluding only that it would not grant mandatory injunctive relief since Appellants failed the less burdensome test for preliminary injunctive relief. *See* Mem. Op. at 5. On appeal, Appellants' 62-page brief devotes all of one paragraph to arguing for this extraordinary form of relief, citing two entirely unrelated cases. In kind, we devote all of one paragraph to concluding that Appellants' request for a structural injunction is without merit.

area is particularly strong, an injunction may issue even if the showings in other areas are rather weak. *Id.* Despite this flexibility, though, a movant must demonstrate "at least some injury" for a preliminary injunction to issue, *id.* (quoting *Population Inst. v. McPherson*, 797 F.2d 1062, 1078 (D.C. Cir. 1986)) (internal quotation marks omitted), for "the basis of injunctive relief in the federal courts has always been irreparable harm," *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (quoting *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506 (1959)) (brackets and internal quotation marks omitted). A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief. *See, e.g.*, *Sea Containers Ltd. v. Stena AB*, 890 F.2d 1205, 1210-11 (D.C. Cir. 1989).

We review a district court's weighing of the four preliminary injunction factors and its ultimate decision to issue or deny such relief for abuse of discretion, though any legal conclusions upon which the district court relies, including whether Appellants have demonstrated irreparable injury, are reviewed de novo. *Mova Pharm. Corp.*, 140 F.3d at 1066; *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 614 (D.C. Cir. 1992).

A

This court has set a high standard for irreparable injury. First, the injury "must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (per curiam). The moving party must show "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.* (citations, brackets, and internal quotation marks

omitted). Second, the injury must be beyond remediation. As we have stated:

> The key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958)) (internal quotation marks omitted).

Appellants fail to articulate a tangible injury that is either "certain and great" or irreparable. Appellants argue the Navy's allegedly unlawful practice of retaining Catholic chaplains past applicable age limits precludes non-liturgical Protestant chaplains from advancing to higher grades, since Congress and the Navy cap the number of officers per grade. *See* 10 U.S.C. §§ 523(a)(2), 12011(a)(2); Decl. of Captain Lyman M. Smith 2 (noting that Congress provides an annual authorization of officers by grade, which the Navy further breaks down by community, for example, Chaplain Corps). Such an injury is far too speculative to warrant preliminary injunctive relief. At most, the Navy's purported practice reduces Appellants' *opportunities* for promotion, which are themselves dependent upon the number of Chaplain Corps vacancies Congress and the Navy authorize each year. Appellants perhaps inadvertently reveal the hypothetical nature of their tangible injury when they refer to "the ultimate relief which would eventually follow resolution of these cases, *e.g.*, *possible* promotions." Appellants' Reply Br. 20 (emphasis added). This statement underscores the absence in

this proceeding of any discrete injury that is "of such *imminence*" that equitable relief is urgently necessary.

In addition, Appellants' asserted tangible injury is redressable. The Navy is authorized to convene special selection boards to review a previous non-promotion. 10 U.S.C. §§ 628, 14502; SECNAV Instruction 1401.1B. Within the reserves, the Navy may convene such a board if an "officer or former officer" failed to receive a promotion selection board's recommendation because, among other reasons, the initial board acted "contrary to law" or its action "involved [a] material error of fact." 10 U.S.C. § 14502(b)(1)(A); SECNAV Instruction 1401.1B ¶ 8(a)(1)-(2). If the special selection board recommends the promotion of a current officer, that officer "shall, as soon as practicable, be appointed to the next higher grade" and "shall, upon such promotion, have the same date of rank, the same effective date for the pay and allowances of that officer's grade, and the same position on the active duty list [or] the reserve active status list . . . that officer would have had" if the original promotion selection board had correctly recommended the officer for promotion. 10 U.S.C. § 14502(e)(1)-(2); SECNAV Instruction 1401.B ¶ 14. Former officers who prevail before the special selection board are entitled to revision of their military record "to correct an error or remove an injustice resulting from not being selected for promotion" by the initial board. 10 U.S.C. § 14502(e)(3). Monetary remedies are available to such officers "if, as a result of correcting a record, [an] amount is found to be due." *Id.* § 1552; *see also, e.g.*, *Marsh v. Johnson*, 263 F. Supp. 2d 49, 51 (D.D.C. 2003) (describing correction of record and back payment award to retired officer after special selection board's reversal of previous failure to recommend for promotion). These measures ensure that, should the courts eventually conclude the Navy has an unlawful practice of retaining Catholic chaplains past applicable age limits to the detriment of non-

liturgical Protestant chaplains, "adequate compensatory or other corrective relief" is available to Appellants, belying their claims of irreparable tangible harm at this point.

B

Having failed to assert a tangible injury that constitutes irreparable harm, Appellants are left to argue that the Navy's alleged violation of the Establishment Clause per se constitutes irreparable harm. The district court rejected this proposition, but we disagree.

Appellants' argument that they would suffer irreparable harm without a preliminary injunction rests on a statement by a three-Justice plurality in *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality opinion), that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Id.* at 373. Because Appellants claim Appellees' practice of retaining overage Catholic chaplains constitutes an impermissible denominational preference in violation of the Establishment Clause, they urge us to apply the language of the *Elrod* plurality on its face and conclude that Appellants have demonstrated irreparable injury — specifically, the harm that flows from the "forbidden message" of marginalization Appellees' actions send to Appellants. Appellants' Br. 20. They note several of our sister circuits have employed *Elrod* to find irreparable harm where moving parties alleged a violation of the Establishment Clause — in other words, the precise context in which we find ourselves. *See ACLU of Ky. v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003), *aff'd on other grounds*, 125 S. Ct. 2722 (2005); *Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996); *Parents' Ass'n of P.S. 16 v. Quinones*, 803 F.2d 1235, 1242 (2d Cir. 1986).

14

Appellees, in contrast, maintain *Elrod* is inapposite because that case involved political speech and expression, a context far removed from the Establishment Clause allegations Appellants advance. They also assert the rationale underlying the *Elrod* plurality's statement was a concern that without preliminary injunctive relief, the First Amendment rights to speech and expression would be "chilled" during the pendency of litigation, a harm that could not be redressed after final judgment. Appellees maintain Appellants have not identified any constitutionally protected behavior that may be chilled in the absence of a preliminary injunction; accordingly, they claim, the concerns motivating the *Elrod* plurality are not present here and Appellants' mere allegations, without more, do not support a finding of irreparable injury.

At first blush, Appellees appear to have the better of this debate. *Elrod* involved political speech and freedom of expression. There, Republican patronage employees of a county sheriff's department brought suit against, among others, a newly elected county sheriff who was a Democrat. *Elrod*, 427 U.S. at 350 (plurality opinion). At the time, it was common for an incoming sheriff of a different political party to replace non-civil-service employees with members of his own party when the existing employees lacked or failed to obtain requisite support from, or failed to affiliate with, the new sheriff's political party. *Id.* at 351. The *Elrod* plaintiffs alleged they had been discharged, or threatened with discharge, solely for these reasons and claimed a violation of, inter alia, the First Amendment. *Id.* at 350. Upon review, a plurality consisting of Justices Brennan, White, and Marshall, with Justice Brennan writing, held, after lengthy discussion, that patronage dismissals are unconstitutional under the First Amendment and that plaintiffs had therefore stated a claim. *Id.* at 373. The plurality then briefly turned to whether a preliminary injunction was warranted, a

determination that hinged upon whether plaintiffs had made out an irreparable injury.  Concluding they had, the plurality stated:

> It is clear . . . that First Amendment interests were either threatened or in fact being impaired at the time relief was sought.  The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury. *See New York Times Co. v. United States*, 403 U.S. 713 (1971).  Since such injury was both threatened and occurring at the time of [plaintiffs'] motion and since [plaintiffs] sufficiently demonstrated a probability of success on the merits, the Court of Appeals might properly have held that the District Court abused its discretion in denying preliminary injunctive relief.

*Id.* at 373-74.  In a footnote to this passage, the plurality noted, "The timeliness of political speech is particularly important." *Id.* at 374 n.29.[7]

The facts of *Elrod*, which involved dismissals from government jobs for failure to ascribe to or gain the approval of a political party; the plurality's citation to *New York Times*, a landmark free expression case; and the footnote stressing the "timeliness of political speech" make evident that the pertinent

---

[7] Justice Stewart, joined by Justice Blackmun, wrote a one-paragraph opinion concurring in the judgment; three Justices dissented, and one took no part in the case.  Because the plurality's discussion of irreparable harm did not enjoy support from a majority of Justices, it is not binding precedent but a "considered opinion" that "should be the point of reference for further discussion of the issue." *King v. Palmer*, 950 F.2d 771, 782 (D.C. Cir. 1991) (en banc) (quoting *Texas v. Brown*, 460 U.S. 730, 737 (1983) (plurality opinion)) (internal quotation marks omitted).

*Elrod* language on which Appellants rely is directed toward circumstances concerning freedom of expression. Indeed, in almost all of the many subsequent cases in which our sister circuits have invoked the *Elrod* plurality's statement, the operative First Amendment liberties allegedly violated were variants of expressive liberties, such as the rights to speak, associate, petition, or exercise one's religion. *See, e.g.*, *Pac. Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1235 (10th Cir. 2005); *Tucker v. City of Fairfield*, 398 F.3d 457, 464 (6th Cir. 2005); *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004); *Newsom v. Albemarle County Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003); *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1226 (9th Cir. 2003); *Tenafly Eruv Ass'n v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002); *Iowa Right to Life Comm., Inc. v. Williams*, 187 F.3d 963, 970 (8th Cir. 1999); *Bery v. City of New York*, 97 F.3d 689, 693-94 (2d Cir. 1996); *Miss. Women's Med. Clinic v. McMillan*, 866 F.2d 788, 795 (5th Cir. 1989); *Romero Feliciano v. Torres Gaztambide*, 836 F.2d 1, 4 (1st Cir. 1987); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983). The number of cases applying *Elrod* to alleged Establishment Clause violations is comparatively meager, *see McCreary Cty.*, 354 F.3d at 445; *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 930 (6th Cir. 2002) (per curiam); *Ingebretsen*, 88 F.3d at 280; *Quinones*, 803 F.2d at 1242, and, furthermore, each of these decisions cites *Elrod* only in passing, devoid of any analysis of its particular context. The single court that focused on *Elrod*'s facts recognized the statement at issue here "was made . . . in the context of free speech" and rejected applying it axiomatically to Establishment Clause claims. *ACLU of Ill. v. City of St. Charles*, 794 F.2d 265, 274 (7th Cir. 1986). Therefore, there is superficial merit to Appellees' argument that *Elrod* ought to play no role in the proceeding before us, which turns entirely on establishment claims.

In addition, Appellees accurately note that this court has construed *Elrod* to require movants to do more than merely allege a violation of freedom of expression in order to satisfy the irreparable injury prong of the preliminary injunction framework. Rather, moving parties must also establish they are or will be engaging in constitutionally protected behavior to demonstrate that the allegedly impermissible government action would chill allowable individual conduct. Thus, for example, in *National Treasury Employees Union v. United States*, 927 F.2d 1253 (D.C. Cir. 1991), we refused to find irreparable harm where federal employees sought a preliminary injunction after alleging that ethics laws prohibiting them from making appearances, delivering speeches, and writing articles for compensation violated their First Amendment rights. *Id.* We noted that while "the loss of First Amendment freedoms, for even minimal periods of time, may constitute irreparable injury," *id.* at 1254 (quoting *Elrod*, 427 U.S. at 373 (plurality opinion)) (brackets and internal quotation marks omitted), movants must show that their "First Amendment interests are either threatened or in fact being impaired at the time relief is sought," *id.* at 1254-55 (quoting *Wagner v. Taylor*, 836 F.2d 566, 577 n.76 (D.C. Cir. 1987) (quoting *Elrod*, 427 U.S. at 373 (plurality opinion))) (brackets omitted). We concluded that because the record did not suggest the plaintiffs would "cease speaking or writing" before the district court resolved their claims, irreparable harm would not follow and preliminary relief could not issue. *Id.* at 1255. Several other courts have adopted this approach, which emphasizes that where it is not clear that a particular statute, policy, or practice will have any actual adverse effect on protected First Amendment liberties, the moving party must demonstrate some likelihood of a chilling effect on their rights. As the Second Circuit has stated:

Where a plaintiff alleges injury from a rule or regulation that directly limits speech, the irreparable nature of the harm may be presumed. . . . In contrast, in instances where a plaintiff alleges injury from a rule or regulation that may only potentially affect speech, the plaintiff must establish a causal link between the injunction sought and the alleged injury, that is, the plaintiff must demonstrate that the injunction will prevent the feared deprivation of free speech rights.

*Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349-50 (2d Cir. 2003); *see also Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) ("[T]he assertion of First Amendment rights does not automatically require a finding of irreparable injury . . . . Rather the plaintiffs must show 'a chilling effect on free expression.'" (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965))); *Am. Postal Workers Union v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985); *cf. Laird v. Tatum*, 408 U.S. 1, 13-14 & n.7 (1972). Accordingly, Appellees are correct when they assert that in this court, as in several others, "there is no *per se* rule that a violation of freedom of expression *automatically* constitutes irreparable harm." Appellees' Br. 23.

But the crucial distinction Appellees fail to recognize, and which ultimately undermines their position, is that freedom of expression is *not* the operative First Amendment right at issue in this case. It is not the freedom to speak, to associate, to petition, to exercise one's religion, or any other liberty that protects an individual's freedom to engage in a particular activity. Rather, the pertinent liberty here is protection against government imposition of a state religion or religious preference. This protection, unlike other First Amendment rights that are variants of the freedom to express oneself, requires no affirmative

conduct on the part of the individual before its guarantees are implicated by government action. As a matter of semantics, an act chills the freedom of an individual to do something; it is incongruous to link the concept of "chilling" with an individual's freedom not to have something done to him. Accordingly, while a particular government action may chill one's propensity to speak, associate, exercise one's faith, or otherwise engage in constitutionally protected individual conduct, where, as here, the claim asserts government imposition of a religious preference, the "chilling effect" rationale is both inapposite and superfluous.

Because of this critical difference, the twin concerns animating Appellees' argument are much less determinative than they initially appear. First, while we have required individuals seeking a preliminary injunction on First Amendment grounds to demonstrate a likelihood that they are engaging or would engage in the protected activity the governmental action is purportedly infringing, we have done so only in the context of free expression, where the relevant constitutional protection is not implicated without some corresponding individual conduct that faces a danger of chilling. But the Establishment Clause is implicated as soon as the government engages in impermissible action. Where, as here, the charge is one of official preference of one religion over another, such governmental endorsement "sends a message to nonadherents [of the favored denomination] that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community." *Lynch v. Donnelly*, 465 U.S. 668, 688 (1984) (O'Connor, J., concurring). This harm, to which Appellants repeatedly refer throughout their briefs, *see, e.g.*, Appellants' Reply Br. 9 ("Here the message is the Navy prefers Catholics."), occurs merely by virtue of the government's purportedly unconstitutional policy or practice establishing a religion, without any concomitant

protected conduct on the movants' part.  Accordingly, Appellees' reliance on *National Treasury Employees Union* and similar cases is misplaced in proceedings concerning alleged Establishment Clause violations.

Second, while *Elrod* arose in the context of political speech, and its operative language has been employed almost exclusively with respect to restrictions on free speech, free exercise of religion, or other variants of freedom of expression, we think it is also applicable to purported Establishment Clause violations. We reach this conclusion not simply by axiomatically applying *Elrod*'s admonition that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," as other courts have done and Appellants urge.  Rather, we emphasize the language surrounding this maxim and note its validity with respect to Establishment Clause claims.  The *Elrod* plurality noted that the plaintiffs' "First Amendment interests were either threatened or in fact being impaired at the time" they sought preliminary injunctive relief, and that because their injury was "both threatened and occurring" and they showed a probability of success on the merits, a preliminary injunction could follow. *Elrod*, 427 U.S. at 373 (plurality opinion).  Because, when an Establishment Clause violation is alleged, infringement occurs the moment the government action takes place — without any corresponding individual conduct — then to the extent that the government action violates the Establishment Clause, First Amendment interests *are* "threatened or in fact being impaired." Of course, this raises the question of the extent to which the disputed government action actually violates the Establishment Clause — but this inquiry is addressed by another prong of the preliminary injunction calculation, the likelihood of the movant's success on the merits.  Within the irreparable harm analysis itself — which assumes, without deciding, that the

movant has demonstrated a likelihood that the non-movant's conduct violates the law — we examine only whether that violation, if true, inflicts irremediable injury.  And because of the inchoate, one-way nature of Establishment Clause violations, which inflict an "erosion of religious liberties [that] cannot be deterred by awarding damages to the victims of such erosion," *City of St. Charles*, 794 F.2d at 275, we are able to conclude that where a movant alleges a violation of the Establishment Clause, this is sufficient, without more, to satisfy the irreparable harm prong for purposes of the preliminary injunction determination.

Appellees expressly disclaim any contention that "Establishment Clause violations can *never* constitute irreparable harm sufficient to warrant a preliminary injunction."  Appellees' Br. 30.  They merely "urge the Court to reject a *per se* rule that alleging an Establishment Clause violation, without anything more, necessarily constitutes irreparable harm."  *Id.*  But this proposition fails for two reasons.  First, we are unable to identify the pivotal "anything more" that movants alleging an Establishment Clause violation could offer in order to demonstrate irreparable harm.  In cases involving purported violations of freedom of speech, association, religious exercise, or other expressive First Amendment liberties, we are able to fashion, and have fashioned, such a line-drawing element: movants must demonstrate a likelihood that they will engage in the constitutionally protected expressive conduct.  But as noted, this notion is not translatable to the First Amendment freedom from government establishment of religion.  The harm inflicted by religious establishment is self-executing and requires no attendant conduct on the part of the individual.  It is unclear what, exactly, movants alleging an Establishment Clause violation could show to differentiate between establishments that inflict irreparable harm and those that do not.

Second, and more significant, Appellees' proposed approach would foreclose *all* possibility of preliminary injunctive relief in Establishment Clause cases based on intangible harm, even those involving the most manifest violations of the Establishment Clause. Consider, for example, a state legislature's decision, with gubernatorial approval, to erect an enormous cross in front of the statehouse, on public property, using public funds. The legislative history unambiguously reveals an intent to raise the cross as a symbol of Christianity and to spread Christian values among the polity. An offended resident would have taxpayer standing to seek removal of the cross, *cf. Flast v. Cohen*, 392 U.S. 83, 105-06 (1968), and would handily win a permanent injunction to that effect. Under Appellees' theory, however, she could not possibly obtain a preliminary injunction ordering removal of the cross during pendency of the litigation, despite the certainty with which she would ultimately prevail on the merits of her claim and the irreparability of the harm inflicted upon her in the meantime. Appellees would have the taxpayer allege something more than a patent violation of the Establishment Clause; yet we cannot imagine what that could be. The result would be an erosion of the very principles of religious freedom the Establishment Clause serves to safeguard. *See City of St. Charles*, 794 F.2d at 275 ("If preliminary injunctions were not available in cases brought to enforce the establishment clause, government might be able to erode the values that the clause protects with a flood of temporary or intermittent infringements."). We reject this position and instead hold that a party alleging a violation of the Establishment Clause per se satisfies the irreparable injury requirement of the preliminary injunction calculus.[8]

---

[8] This conclusion presupposes, of course, that the party has standing to allege such a violation.

We stress that a finding of irreparable injury is but one of four elements that comprise the preliminary injunction framework. The mere allegation that the government is violating the Establishment Clause may suffice to satisfy the irreparable harm prong, but a preliminary injunction will not issue unless the moving party also shows, on the same facts, a substantial likelihood of success on the merits, that the injunction would not substantially injure other interested parties, and that the public interest would be furthered by the injunction. It is these other prongs that will ultimately determine meritorious motions for preliminary injunctions in the face of purported Establishment Clause violations. Unsupported or undeveloped allegations of government establishment, for example, while sufficient to make out irreparable injury, will not withstand scrutiny concerning the movant's likelihood of success on the merits, thereby defeating a request for a preliminary injunction. Likewise, demands for preliminary relief that inflict untoward detriment on persons not party to the case will meet a similar fate, as will motions that do not further the public interest. Thus we do not believe that our decision today in any way lessens the burden for parties seeking preliminary injunctive relief against purported Establishment Clause violations. It merely focuses greater attention on the three other factors that indisputably enter into the preliminary injunction determination.

Appellants allege that Appellees' practice of retaining overage Catholic chaplains constitutes a denominational preference in violation of the Establishment Clause. If true, which we assume is the case for purposes of the irreparable injury prong, the government has, without anything more, infringed upon Appellants' freedom from government establishment of religion, constituting irreparable harm. The district court committed error in finding otherwise.

24

III

Having reached a conclusion contrary to the district court with respect to Appellants' irreparable injury, we must decide whether to proceed with the remainder of the preliminary injunction determination, as Appellants urge, or remand the case to the district court, as Appellees insist. We believe the proper course of action at this point is to remand to the district court.

When denying a preliminary injunction, a district court "shall . . . set forth the findings of fact and conclusions of law which constitute the grounds of its action." Fed. R. Civ. P. 52(a). "It is of the highest importance to a proper review of the action of a court in granting or refusing a preliminary injunction that there should be fair compliance with Rule 52(a)." *Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316 (1940). The district court here confined its analysis to determining whether irreparable harm would visit Appellants without interim relief. It expressly withheld consideration of the three other factors that enter into the preliminary injunction calculus. *See* Mem. Op. at 5 & n.2. Accordingly, the "conclusions of law" as to these other factors that Rule 52(a) requires are not present. *See Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003); *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 423 (4th Cir. 1999) ("Requiring trial courts to explain their injunction orders serves at least two important purposes. First, it allows the parties to better understand the reasons for the court's actions. Second, a written explanation of the district court's reasoning permits an appellate court to meaningfully review that decision."); 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2576 (2d ed. 1995) ("If the appellate court finds that it cannot review the case meaningfully without findings and conclusions, it may remand so that findings can be made."). We

are therefore disposed to remand to the district court to pick up where it left off.

We are aware that because our review of the legal findings supporting a district court's preliminary injunction determination is de novo, the absence of legal findings does not necessarily preclude us from undertaking appellate review. *See LGS Architects, Inc. v. Concordia Homes of Nev.*, 434 F.3d 1150, 1155 (9th Cir. 2006). But our review of the district court's balancing of the four preliminary injunction factors and ultimate decision to grant or deny such relief is for abuse of discretion, and without any conclusions of law as to the three remaining factors, we are unable to determine whether the district court properly carried out this function. *See Hoechst Diafoil*, 174 F.3d at 423. A remand would also effect greater development of the remaining preliminary injunction factors, particularly Appellants' likelihood of success on the merits, which we believe advisable. Indeed, in explicitly choosing not to address the three other components, the district court noted that if later required to turn to them, it would "likely benefit" from further elaboration of certain arguments raised before it concerning the merits of Appellants' claim. Mem. Op. at 5 n.2. Both precedent and prudence, therefore, counsel a remand to the district court so that a "full understanding of the issues" may be attained. *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997); *cf. New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 13 (1st Cir. 2002) ("Injunctive relief is, by its very nature, fact-sensitive and case-specific. For that reason, the court of appeals ordinarily will not uphold a preliminary injunction on a ground that was not fully addressed by the trial court.").

26

IV

By alleging that Appellees are engaging in conduct that violates the Establishment Clause, Appellants have satisfied the irreparable injury prong of the preliminary injunction framework. We therefore reverse the district court on this point, vacate its denial of preliminary injunctive relief, and remand for the court to carry out the remainder of the preliminary injunction analysis. We affirm the district court's denial of structural injunctive relief, and we have no jurisdiction to rule on its denial of partial summary judgment.

*So ordered.*