**Thomas G. DAVIS, et al., Plaintiffs,**

v.

**PENSION BENEFIT GUARANTY CORPORATION, Defendant.**

**Civil Action No. 08–1064 (JR).**

United States District Court, District of Columbia.

Dec. 2, 2008.

Anthony F. Shelley, Timothy Patrick O'Toole, Miller & Chevalier, Washington, DC, for Plaintiffs.

Joseph M. Krettek, Pension Benefit Guaranty Corporation, Office of the Chief Counsel, Washington, DC, for Defendant.

### MEMORANDUM ORDER

JAMES ROBERTSON, District Judge.

Plaintiffs are approximately 1700 retired U.S. Airways pilots. They seek a preliminary injunction that would prohibit defendant Pension Benefit Guaranty Corporation (PBGC) from pursuing recoupment actions while this suit is pending, or, if recoupment is warranted, preserve the option of installment payments. Their motion [# 11] will be denied.

### Background

PBGC, a United States government corporation, administers the pension insurance program established by Title IV of ERISA. 29 U.S.C. §§ 1301–71. When a pension plan terminates without enough assets to cover its obligations, PBGC "must add its own funds to ensure payment of most of the remaining 'nonforfeitable' benefits." *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 637–38, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). PBGC may also ask to be appointed trustee of the terminated plan, 29 U.S.C. § 1342(b); if that request is granted—which it "invariably" is—PBGC becomes responsible for distributing the plan's benefits. *Boivin v. U.S. Airways, Inc.*, 446 F.3d 148, 150 (D.C.Cir.2006).

In 2003, a federal court terminated U.S. Airways' pension plan (the "Plan") under ERISA's "distress termination" provision and appointed PBGC trustee. *In re U.S. Airways Group, Inc.*, 296 B.R. 734 (Bankr.

E.D.Va.2003). After reviewing the Plan's provisions and allocating the remaining assets according to the six-tier statutory scheme, 29 U.S.C. § 1344, PBGC began paying estimated benefits to the Plan's participants. Certain participants—including many of the plaintiffs here—disputed PBGC's benefits calculations in an administrative proceeding before the PBGC Appeals Board. In February 2008, the Board rejected all significant challenges to PBGC's calculations. *See* Dkt. 9, Ex. A.

Shortly after the Board ruling, PBGC determined that it had overpaid approximately 110 retired pilots and sent out initial recoupment notices,[1] offering the pilots the opportunity to pay back their debt in installments. *See* Dkt. 11, Ex. A. Before the pilots acted on the notices, the plaintiffs filed this suit challenging PBGC's benefits calculations and asked PBGC to cease recoupment efforts while the litigation was ongoing. *Id.,* Ex. B. PBGC refused, issued second recoupment notices, and threatened to eliminate the installment repayment option if the pilots did not agree to the installment plan within thirty days. *Id.,* Ex. D. The plaintiffs subsequently filed this motion.

### *Analysis*

"To demonstrate entitlement to a preliminary injunction, a litigant must show 1) a substantial likelihood of success on the merits, 2) that it would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially

injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C.Cir. 1998). These factors are evaluated on a sliding scale: "[i]f the showing in one area is particularly strong, an injunction may issue even if the showings in other areas are rather weak." *Chaplaincy of Full Gospel Churches v. England,* 454 F.3d 290, 297 (D.C.Cir.2006).

Although the plaintiffs have shown that the balance of harms tips slightly in their favor, they have failed to demonstrate a substantial likelihood of success on the merits.

### A. Merits

In their motion, the plaintiffs focus on three of the eleven claims they raise in their amended complaint: Claims One, Two, and Ten. *See* Dkt. 9. The plaintiffs need only show a substantial likelihood of success on one of these claims.[2]

The plaintiffs have an uphill climb on the merits of all three claims, however, because they all challenge PBGC's interpretations of ERISA, and those interpretations are customarily entitled to *Chevron* deference. *See* Dkt. 12, at 14 (citing *Beck v. PACE Int'l Union,* 551 U.S. 96, 127 S.Ct. 2310, 2317, 168 L.Ed.2d 1 (2007); *Pension Benefit Guaranty Corp. v. LTV Corp.,* 496 U.S. 633, 648, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); *Mead Corp. v. Tilley,* 490 U.S. 714, 722, 109 S.Ct. 2156,

---

1. Technically, PBGC sent out both "recoupment" and "recovery" notices. PBGC "recoups" money from those who are still receiving benefits, and "recovers" money from those who are no longer receiving benefits. *See* Dkt. 11, at 1. For simplicity, I will use "recoupment" to cover both actions.

Approximately 37 pilots received recoupment notices, and approximately 74 pilots received recovery notices. Dkt. 12, at 7. On average, the recoupment notices called for a

$60 monthly benefit reduction, and the recovery notices called for repayment of $7100. *Id.*

2. PBGC notes that the plaintiffs simply assume that success on any claim will reduce the debt the retired pilots owe. See Dkt. 12, at 30. In the absence of any evidence to the contrary, and for the purposes of this motion, that assumption will be considered sound.

104 L.Ed.2d 796 (1989)). The plaintiffs point out that, unlike in the cited cases, PBGC here is acting as a trustee, not just as a guarantor, and a trustee's benefits determinations are not usually entitled to deference. *See Metro. Life Ins. Co. v. Glenn,* — U.S. ——, 128 S.Ct. 2343, 2347–48, 171 L.Ed.2d 299 (2008). They contend that deference is particularly unwarranted in this case because PBGC has a financial interest in interpreting ERISA to deny benefits. *Id.* at 2348.

I am nevertheless inclined to apply *Chevron* deference, for two reasons. First, PBGC—no matter what its role— has "practical agency expertise" that makes it "better equipped" to interpret and apply ERISA than the courts. *LTV Corp.,* 496 U.S. at 651–52, 110 S.Ct. 2668. Second, courts have consistently deferred to PBGC when it is acting solely as a guarantor even though PBGC often has a financial interest in a particular interpretation of ERISA in that role. *See, e.g., id.* at 648, 110 S.Ct. 2668 (applying *Chevron* deference to PBGC's decision under ERISA to restore a previously terminated pension plan even though the decision saved PBGC money).

Accordingly, for each of the plaintiffs' claims, I will first "question whether Congress has directly spoken to the precise question at issue," and, if it has not, then proceed to evaluate "whether the agency's [interpretation] is based on a permissible construction of the statute." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### 1. Claim One

Claim One concerns the "Magic Five" benefit: a Plan provision that awards additional benefits to eligible pilots who retire early. Under ERISA, the assets in a terminated plan are distributed in order of priority—benefits in priority category 1 are paid in full before benefits in priority category 2, and so on through priority category 6. *See* 29 U.S.C. § 1344(a). PBGC determined that there were enough assets remaining in the Plan to pay out all benefits in priority categories 1–3. Dkt. 12, at 23. In Claim One, the plaintiffs challenge PBGC's conclusion that the Magic Five benefit does not belong in priority category 3.

> In relevant part, priority category 3 covers: a participant's or beneficiary's benefit ... which would have been in pay status as of the beginning of such 3–year period if the participant had retired prior to the beginning of the 3–year period and if his benefits had commenced (in the normal form of annuity under the plan) as of the beginning of such period, to each such benefit based on the provisions of the plan (as in effect during the 5–year period ending on such date) under which such benefit would be the least.

*Id.* § 1344(a)(3)(B). The "periods" refer to time before the plan's termination date; therefore, priority category 3 covers benefits based on provisions that were "in effect" five years before termination.

The parties dispute whether the provision creating the Magic Five benefit was "in effect" on April 1, 1998 (five years before the Plan's termination on March 31, 2003): the plaintiffs contend that the provision was "adopted on December 4, 1997 and expressly made effective on January 1, 1998," Dkt. 11, at 11, while PBGC argues that the provision was only "in effect" on May 1, 1998 because that was the first date on which pilots could retire and become eligible for the Magic Five benefit.

The statute is ambiguous because the meaning of the phrase "in effect" is uncertain, and because the phrase could refer either to the "provisions of the plan" or to

"each such benefit." Under *Chevron,* therefore, PBGC's interpretation need only be "permissible."

PBGC's interpretation, while not entirely convincing, is certainly permissible in the context of the ERISA framework and the relevant implementing regulations. PBGC notes that plan provisions often call for periodic changes to benefit levels—for example, annual cost-of-living increases—and that PBGC treats these benefit increases as "in effect" on the day on which they become available to the plan participants, not on the day on which the original plan provision became effective. *See* Dkt. 12, at 20 (citing 29 C.F.R. § 4022.24(d)). In keeping with this approach, PBGC determined that the Magic Five benefit was only in effect on the first day plan participants could retire and receive the benefit: May 1, 1998.

Moreover, 29 C.F.R. § 4044.13 states that the benefit assigned to category 3 is "the lesser of the lowest annuity benefit in pay status during the 3–year period ending on the termination date and the lowest annuity benefit payable under the plan provisions at any time during the 5–year period ending on the termination date." Because a pilot who retired in April 1998—the first month of the five-year period before termination—would not receive the Magic Five benefit, the "lowest annuity benefit payable under the plan provisions . . . during the 5–year period" would not include the benefit.

### 2. Claim Two

Like Claim One, Claim Two challenges PBGC's decision to exclude a particular benefit from priority category 3. Section 415(b) of the Internal Revenue Code imposes a limit on the annual maximum pension. *See* 26 U.S.C. § 415(b). Section 7.1 of the Plan prohibits payment of pension benefits in excess of the section 415 cap, but section 7.2 automatically changes the

section 7.1 cap if Congress raises the section 415 cap. In 2001—two years before the Plan terminated—Congress raised the section 415 limit, and Plan benefits increased commensurately. The plaintiffs dispute PBGC's determination that this benefit increase does not fall in priority category 3.

Once again, PBGC's conclusion is a permissible interpretation of the statute. Again, the benefit assigned to category 3 is "the lesser of the lowest annuity benefit in pay status during the 3–year period ending on the termination date and the lowest annuity benefit payable under the plan provisions at any time during the 5–year period ending on the termination date." 29 C.F.R. § 4044.13(b)(3). But for automatic increases such as the one in section 7.2 of the Plan, "the lowest annuity benefit payable during the 5–year period ending on the termination date includes the automatic increases scheduled during the fourth and fifth years preceding termination." *Id.* § 4044.13(5). Therefore, any automatic increases in the three years before termination—including the 2001 increase at issue here—are rightly excluded from priority category 3.

### 3. Claim Ten

The plaintiffs assert that PBGC's failure to "guarantee . . . the payment of all nonforfeitable benefits," 29 U.S.C. § 1322(a), violates ERISA because PBGC's "insurance obligation must be added to the Plan asset distribution for each [of the plaintiffs] [ ] in the event all vested benefits are not paid from the remaining assets of the terminated plan." Dkt. 11, at 20. The quoted statutory language omits the crucial caveat that PBGC guarantees payment of all nonforfeitable benefits "[s]ubject to the limitations contained in subsection (b)," of which there are many. *See* 29 U.S.C. § 1322(b). PBGC guarantees that each plan participant receives some minimum

level of benefits, *see* 29 C.F.R. § 4022.3; if a plan terminates without sufficient funds to provide that level of benefits, PBGC contributes to the plan. But if, as here, the plan terminates with enough assets to provide more than the guaranteed level of benefits, PBGC simply distributes the benefits according to the six-tier scheme in 29 U.S.C. § 1344(a). There is no support in ERISA for the plaintiffs' position.

### B. Other Factors

Without a demonstration of a substantial likelihood of success on the merits, the plaintiffs have to make an overwhelming showing on the remaining three factors. They fall well short of that mark.

The balance of harms favors the plaintiffs—but only slightly. As PBGC points out, "economic loss does not, in and of itself, constitute irreparable harm," but that is because there is the "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). Here, adequate compensation may not be available because: many of the plaintiffs are elderly retirees, and some may not live to receive compensation if it is warranted; and many plaintiffs will have to withdraw money from their IRAs to pay off their purported debts, and will be unable to return money to their IRAs if compensatory damages are awarded, costing them on both ends. *See* Dkt. 18, at 20–21. Although the irreparable harm to the plaintiff outweighs any harm to PBGC—which, as a multi-billion dollar entity, can surely wait to collect a debt of $1 million or so, *see* Dkt. 18, at 24—it does not overcome the plaintiffs' inability to make the necessary showing on the merits.

The public interest factor is a wash. PBGC notes that it must, by statute, pursue recoupment, and that the consistent failure to recoup will drive up insurance premiums for employers. Dkt. 12, at 33. The plaintiffs observe that Congress has decried the "great personal tragedy" for employees who do not receive their vested pension benefits. *See Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 374–75, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). Neither argument is particularly compelling, and neither swings the equitable balance meaningfully in one direction or another.

### *Conclusion*

Because the plaintiffs cannot demonstrate a substantial likelihood of success on the merits, and cannot make a strong enough showing on the other three preliminary injunction factors, their motion for a preliminary injunction [# 11] is **denied.**