In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-2673

VITO CONTILLI,

*Plaintiff-Appellant,*

*v.*

LOCAL 705 INTERNATIONAL BROTHERHOOD OF
TEAMSTERS PENSION FUND and LOCAL 705
INTERNATIONAL BROTHERHOOD OF TEAMSTERS
HEALTH AND WELFARE FUND,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 0080—**James B. Zagel**, *Judge.*

ARGUED FEBRUARY 12, 2008—DECIDED MARCH 23, 2009

Before EASTERBROOK, *Chief Judge*, and RIPPLE and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge.* "Each pension plan shall
provide that an employee's right to his normal retirement
benefit is nonforfeitable upon the attainment of normal
retirement age". 29 U.S.C. §1053(a). Vito Contilli turned
65, the "normal retirement age" of the Teamsters Local 705

Pension Fund, on August 30, 1995. He retired in October 1997 and applied for retirement benefits in January 1998. The Fund approved his application and in February 1998 started paying him a monthly pension of $2,623.50. It did not pay Contilli anything for the post-retirement months of November and December 1997 and January 1998, nor did it increase his monthly benefit so that the actuarial value of the pension starting in February 1998 was equivalent to that of a pension starting in November 1997.

Contilli contends in this suit under 29 U.S.C. §1132(a)(1) that the Fund's failure either to start his pension in November 1997, or to increase the monthly benefit so that his pension has the same value as if payment had begun in November 1997, violates the non-forfeiture rule of §1053(a), a part of the Employee Retirement Income Security Act (ERISA). The district court held, however, that a plan is entitled to adopt and enforce a rule requiring retirees to apply for their pensions. As the Fund simply applied to Contilli a generally applicable rule, no forfeiture occurred.

Because a rule about the way in which pension benefits are calculated when an application is deferred affects many thousands of workers, we asked the United States to file a brief as amicus curiae. That brief tells us that an actuarial adjustment of benefits is essential to avoid a forfeiture, when payment does not begin immediately after retirement. See 29 U.S.C. §1054(c)(3); 26 U.S.C. §411(c)(3); 26 C.F.R. §1.411(a)–7(a)(1)(ii), 1.411(c)–1(e)(1). (These regulations, though issued under a tax statute,

also apply to the cognate portions of ERISA as a result of a delegation from the Department of Labor to the Department of the Treasury. See 29 U.S.C. §1202(c); 29 C.F.R. §2530.200a–2; Reorganization Plan No. 4 of 1978, §101, 43 Fed. Reg. 47713.) We agree with this conclusion and therefore reverse the district court's decision.

A right is non-forfeitable under §1053(a) if "it is an unconditional right." 26 C.F.R. §1.411(a)–4(a). Requiring an application for benefits is a condition on the receipt of payment, and so it works a forfeiture of the pre-application benefits unless an actuarial adjustment is made for months that have been lost. See *Cotter v. Eastern Conference of Teamsters Retirement Plan*, 898 F.2d 424, 428 (4th Cir. 1990). ERISA and the implementing regulations recognize that payment of benefits often will be deferred; there is no problem with an application requirement. But the payments skipped as a result of the deferral must be made up, either by payment (with interest) once the deferral ends, or by a suitable actuarial adjustment to the ongoing benefits; otherwise the value of the pension is lower than one that begins on the normal retirement date, and a reduction in the total value of all monthly benefits is a kind of forfeiture. See *Berger v. Xerox Corp. Retirement Income Guarantee Plan*, 338 F.3d 755, 759 (7th Cir. 2003); *Esden v. Bank of Boston*, 229 F.3d 154, 163 (2d Cir. 2000).

There is an exception to the actuarial-adjustment requirement for a participant who puts off retirement while continuing to work. See 29 U.S.C. §1053(a)(3)(B). So the Fund was entitled to start Contilli's pension in

November 1997, when he retired, rather than in September 1995, the month after his 65th birthday; it did not need to send him catch-up checks for those two years or make any adjustment other than what the plan itself required. (The Fund is a standard defined-benefit plan. A pension depends on the number of years of credited service, so extra months of work automatically yield a higher monthly pension.) But once Contilli retired his entitlement was fixed, and the Fund's failure to pay any month's benefit worked a forfeiture of that amount.

The Fund does not have an answer to this point. Instead it seems to have confused the anti-forfeiture rule in §1053(a) with the anti-cutback rule in 29 U.S.C. §1054(g). The anti-cutback rule provides that, once a participant's right to a benefit has vested, the terms of a pension plan cannot be changed to reduce the amount of that benefit. See *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739 (2004). The Fund observes that its rule requiring an application for pension benefits, and starting benefits only after an application has been approved, was in place before Contilli reached normal retirement age and has been applied consistently. This shows that a cutback has not occurred. But it does not address §1053(a), which deals with entitlement to benefits under a plan's terms. The problem with this plan's terms is not that benefits have been reduced generally (they haven't) but that the application rule causes a forfeiture unless the participant applies before his "normal retirement age". The Local 705 Fund does not make that actuarial adjustment and so is out of compliance with §1053(a).

There is one potential complication. Some statements in the briefs suggest that pension benefits were increased in January 1998, but only for participants who retired in that month or later. Contilli may have timed his application strategically to take advantage of this increase. The anti-forfeiture rule in §1053(a) applies, however, only to the benefits available on a person's normal retirement date. Thus if Contilli wants his pension benefits for November and December 1997 and January 1998 (or their actuarial equivalent in higher future pension checks), he must accept the pension schedule that was in force in October 1997, when he retired, plus any increases paid to persons who were in retirement status on January 1, 1998. He cannot have the higher pension for persons who retired in January 1998 and later, plus the extra months' benefits that he could have received by submitting his application in October 1997. If the Fund is paying Contilli at a higher monthly rate reflecting an increase in January 1998, he may already have received the actuarial equivalent (and then some) of the three missing months' benefits calculated at the rate applicable to someone who retired in 1997. The parties (and if necessary the district judge) must work this subject out on remand.

There remains a dispute about how many months' service the Fund should credit Contilli for during 1996 and 1997, when he worked sporadically. Contilli's appellate brief is hard to follow, but as best we can make out he concedes that the Fund gave him credit for all months in which, according to his employers' returns, he worked the minimum number of hours required for

pension credit. The dispute concerns months in which he was on sick leave—or would have been on sick leave, had he paid the health-insurance premiums required by the Local 705 Health and Welfare Fund for those participants who are not working enough hours to receive health benefits as part of their fringe-benefits package. Time on sick leave qualifies as time on the job for pension purposes, but the Health and Welfare Fund did not certify to the Pension Fund that Contilli was on sick leave for particular hours that would (he says) have produced enough work and sick hours combined to support additional pension credit. And the reason the Health and Welfare Fund did not certify Contilli's sick-leave status is that he did not pay the premium for health coverage that the Health and Welfare Fund demanded.

Contilli concedes that he did not pay, but he says that the Health and Welfare Fund asked for more money than the legal limit for what is conventionally called "COBRA continuation coverage." 29 U.S.C. §§ 1161–69. He now contends that, if the Health and Welfare Fund had named the right premium, he would have paid it, and the Pension Fund then would have given him additional work credits that would have increased his monthly pension.

There are two problems with this line of argument (if we have divined what Contilli is arguing). One is that an error by the Health and Welfare Fund does not support relief against the Pension Fund, a distinct entity. When the Health and Welfare Fund certifies sick leave as eligibility for work credits, it also makes to the Pension Fund

a payment in lieu of the contribution that an employer would have made had the participant still been working. (We say "an" employer because this is a multi-employer fund, and the Pension Fund may collect from several employers, plus the Health and Welfare Fund, for covered hours of any given participant.) The other problem is that Contilli did not present his contention to the Health and Welfare Fund, which therefore never has had a chance to (a) collect the appropriate premium, and (b) determine if Contilli really would have paid the correct premium in 1996 and 1997, as he now says. The district court found that Contilli had not made the appropriate requests and thus had failed to exhaust his administrative remedies.

Contilli's opening brief ignored this adverse ruling and argued as if both the Health and Welfare Fund and the district court had resolved the merits. His reply brief does discuss forfeiture—but too late, and that brief misses the point. The reply brief asserts that a proper notice of COBRA continuation coverage "is mandatory and cannot be waived" (Reply Br. 16). But the district court did not find that Contilli had waived the receipt of a notice specifying his right to health coverage. The court concluded that Contilli had failed to alert the Health and Welfare Fund to the supposed error in the premium and give it an opportunity to make any appropriate findings and adjust benefits accordingly. Exhaustion of administrative remedies is one of ERISA's requirements. See, e.g., *Gallegos v. Mt. Sinai Medical Center*, 210 F.3d 803 (7th Cir. 2000).

The coverage argument that Contilli did preserve—by presenting it to the plans and raising it in the district

court—was that some of the employers for which he worked in 1996 and 1997 did not make proper contributions to the Pension Fund, which therefore did not credit him with all of his service. To the extent that Contilli addresses exhaustion, he maintains that the plans' failure to provide him with a history of his employer contributions justified his failure to exhaust these matters with the Trustees. But a shortcoming on the matter of employer contributions does not justify the omission of a COBRA argument from the submissions to the two Funds. Arguments about employers' contributions to the Pension Fund have not been advanced on appeal. So the coverage-related arguments in the appellate brief were not preserved, and the preserved arguments have not been renewed.

Now it may be that we have not grasped all of Contilli's arguments, but we have done the best we could with a scattershot presentation. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). If there is some argument that we have missed, but that was preserved both in the administrative process and the district court, Contilli may present it on remand. If there is another appeal, each distinct argument should be highlighted and the basis for thinking it preserved for appellate resolution must be explained in detail.

The judgment is vacated, and the case is remanded for proceedings consistent with this opinion.