# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 10, 2013        Decided November 1, 2013

No. 12-5274

THOMAS G. DAVIS, ET AL.,
APPELLANTS

v.

PENSION BENEFIT GUARANTY CORPORATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:08-cv-01064)

*Anthony F. Shelley* argued the cause for appellants. With him on the briefs were *Timothy P. O'Toole* and *Michael N. Khalil.*

*James J. Armbruster*, Assistant Chief Counsel, Pension Benefit Guaranty Corporation, argued the cause for appellee. With him on the briefs were *Judith R. Starr*, General Counsel, *Kenneth J. Cooper*, Assistant General Counsel, *Kimberly J. Duplechain*, Attorney, *Israel Goldowitz*, Chief Counsel, *Charles L. Finke*, Deputy Chief Counsel, *Paula J. Connelly* and *Garth D. Wilson*, Assistant Chief Counsel, and *Joseph Krettek*, Attorney.

Before: GARLAND, *Chief Judge*, ROGERS, *Circuit Judge*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Appellants are approximately 1,700 retired U.S. Airways pilots and their beneficiaries ("the Pilots"). They appeal the grant of summary judgment to the Pension Benefit Guaranty Corporation ("PBGC") on their claims regarding pension benefits payable under the terminated Retirement Income Plan for U.S. Airways Pilots ("the Plan"). Of the Pilots' twelve claims, three claims are not appealed and four claims that are appealed but were not briefed are forfeited. For the following reasons, upon *de novo* review, *see Stephens v. U.S. Airways Grp.*, *Inc.*, 644 F.3d 437, 439 (D.C. Cir. 2011), we affirm as to the five remaining claims.

## I.

We begin with an overview of the statutory and regulatory scheme and then summarize the factual background and procedural history before turning, in Part II, to the merits of the Pilots' five claims.

## A.

Congress enacted the Employee Retirement Income Security Act of 1974 ("ERISA") to establish "minimum standards . . . assuring the equitable character of [employee benefit] plans and their financial soundness." Pub. L. No. 93-406, § 2(a), 88 Stat. 829, 833 (codified at 29 U.S.C. § 1001(a)). Title IV of ERISA created the PBGC, a "U.S. government corporation within the Department of Labor that insures private-sector defined-benefit pension plans." *Boivin v. U.S. Airways*, 446 F.3d 148, 150 (D.C. Cir. 2006); 29 U.S.C. § 1302. This "mandatory Government insurance program . . . protects the pension benefits" of participants in or beneficiaries of qualified plans. *PBGC v. LTV Corp.*, 496 U.S. 633, 637 (1990) ("*LTV Corp.*"). It does so by guaranteeing a class of "nonforfeitable

benefits," 29 U.S.C. § 1322(a), reimbursing eligible participants or beneficiaries when a guaranteed plan terminates without sufficient funds.

If a qualified plan has insufficient assets to satisfy its pension obligations the employer can terminate the plan voluntarily or the PBGC can terminate it involuntarily. *See LTV Corp.*, 496 U.S. at 638; 29 U.S.C. §§ 1341(c), 1342(a). When termination proceedings have begun, as occurred here, the PBGC can request that the district court appoint it as trustee of the plan. *See Boivin*, 446 F.3d at 150; 29 U.S.C. § 1342(b). When a district court grants the request, the PBGC remains the guarantor of the plan, *see Boivin*, 446 F.3d at 150, and therefore has two roles: As guarantor, the PBGC is responsible for covering the gap between the assets of the plan and the amount guaranteed to the plan's beneficiaries, *see LTV Corp.*, 496 U.S. at 637–38; 29 U.S.C. §§ 1301(a)(8), 1322(a). As trustee, the PBGC administers the plan – i.e., determines who is entitled to benefits, *see* 29 U.S.C. § 1342(d), and acts as a fiduciary with respect to the plan, *see id.* §§ 1342(d)(3), 1002(21).

The administrator of a terminated plan distributes assets in accordance with the six tier priority scheme set forth in 29 U.S.C. § 1344. The Pilots' claims relate to priority category three, which includes allocations

> in the case of benefits payable as an annuity—
>
> (A) in the case of the benefit of a participant or beneficiary which was in pay status as of the beginning of the 3-year period ending on the termination date of the plan, to each such benefit, based on the provisions of the plan (as in effect during the 5-year period ending on such date) under which such benefit would be the least,

(B) in the case of a participant's or beneficiary's benefit (other than a benefit described in subparagraph (A)) which would have been in pay status as of the beginning of such 3-year period if the participant had retired prior to the beginning of the 3-year period and if his benefits had commenced (in the normal form of annuity under the plan) as of the beginning of such period, to each such benefit based on the provisions of the plan (as in effect during the 5-year period ending on such date) under which such benefit would be the least.

For purposes of subparagraph (A), the lowest benefit in pay status during a 3-year period shall be considered the benefit in pay status for such period.

29 U.S.C. § 1344(a)(3). These provisions exclude certain benefits from priority category three based on whether (1) they were in pay status (i.e., actually being paid) or could have been in pay status (if an individual had retired) within three years of the date of plan termination and (2) the provisions of the plan creating them were "in effect" within the five-year period prior to plan termination.

By regulation, 29 C.F.R. § 4044.13, the PBGC has interpreted the limitations on inclusion in priority category three. Section § 4044.13(a), "Definition," provides that "[b]enefit increases, as defined in [29 C.F.R.] § 4022.2, that were in effect throughout the 5-year period ending on the termination date, including automatic benefit increases during that period to the extent provided in paragraph (b)(5) of this section, shall be included in determining the priority category 3 benefit." And § 4044.13(b)(5) provides that "automatic increases in the benefit formula" provided for in "plan provisions" that were "adopted and effective on or before the first day of the 5-year period

ending on the termination date" will be included in priority category three if the increases were scheduled to occur during the fourth and fifth years preceding termination. The PBGC interprets "benefit increases" to include increases in benefits due to cost-of-living adjustments ("COLAs") arising out of increases in the Internal Revenue Code's § 415(b) dollar limits on annual benefits, 26 U.S.C. § 415(b), which were incorporated into the Plan. As such, the PBGC honored such increases if they occurred in the fourth and fifth years prior to Plan termination but not those occurring within the three years prior to termination. The Pilots regard § 4044.13(b)(5) as irrelevant to the status of the COLAs, which they claim are not benefit increases but limitation adjustments. Instead they maintain that the Plan provisions recognized such COLAs more than five years before termination, and, under ERISA, the fact that the provision was in place more than five years prior to Plan termination is enough for the PBGC to honor all § 415(b) increases during the entire five-year period before termination. *See infra* Part II, Claim Two.

Section 4044.13(b), "Assigning benefits," provides that "a plan or amendment is 'in effect' on the later of the date on which it is adopted or the date it becomes effective." 29 C.F.R. § 4044.13(b)(6). As discussed in Part II, such a construction implies that an amendment could be effective before it has been adopted — e.g., when a benefit payment is made retroactive to a date prior to the adoption of the amendment that created it. The Pilots contend that the PBGC Appeals Board decision as to the effective date of a Plan amendment conflicts with this regulation. *See infra* Part II, Claim One.

The PBGC also has promulgated regulations regarding how it handles benefit determinations. The PBGC makes initial determinations "with respect to allocation of assets under section 4044 of ERISA [(29 U.S.C. § 1344)]." 29 C.F.R.

§ 4003.1(b)(4). They are issued in writing and must "state the reason for the determination." *Id*. § 4003.21. "Any person aggrieved by an initial determination . . . may file an appeal," *id*. § 4003.51, to be considered by the PBGC Appeals Board, which is composed of three PBGC officials, *id*. § 4003.2. In a written appeal, appellants can request to appear before the Board and present witnesses to testify before the Board. *Id*. § 4003.54. The Board has discretion to reject such requests. *Id*. § 4003.55(b). A decision issued by the Appeals Board "constitutes the final agency action by the PBGC with respect to the determination which was the subject of the appeal." *Id*. § 4003.59(b).

**B.**

In 2002, U.S. Airways filed for bankruptcy and requested that its pilots' benefits plan be terminated pursuant to ERISA's "distress" termination procedures. *See* 29 U.S.C. § 1341(c). The Plan terminated on March 31, 2003. The PBGC became trustee and began making estimated payments to the retired pilots pending its initial determinations on proper asset allocation.

The Pilots first brought suit in November 2003, challenging the PBGC's calculation of estimated benefits. On appeal, this court rejected the Pilots' claims for failure to exhaust administrative remedies. *See Boivin*, 446 F.3d at 158–59. Later the PBGC issued initial determinations, and the Pilots appealed to the PBGC Appeals Board, which issued the first of several decisions on February 29, 2008. The Pilots challenged the PBGC's final determinations in the district court in June 2008 on the grounds that the PBGC has misapplied ERISA, misinterpreted the Plan itself, and breached its fiduciary duties to Plan participants and beneficiaries. The Pilots moved for a preliminary injunction in August 2008. In September 2008, the PBGC issued a decision related to some of the Pilots' disability

claims.  The district court denied the motion for a preliminary injunction in December 2008, *see Davis v. PBGC*, 596 F. Supp. 2d 1, 5 (D.D.C. 2008), and this court affirmed, *see Davis v. PBGC*, 571 F.3d 1288, 1295 (D.C. Cir. 2009).  Thereafter the district court granted summary judgment to the PBGC on all but one claim.  *See Davis v. PBGC*, 864 F. Supp. 2d 148, 172 (D.D.C. 2012); *see also Davis v. PBGC*, 815 F. Supp. 2d 283 (D.D.C. 2011).

## II.

The Pilots now appeal nine of the claims stated in their second amended complaint.  They have, however, only provided argument in support of five claims.  In this circuit, "[i]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'" *Consol. Edison Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007) (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).  As more recently explained, "by failing to include any relevant arguments in their appellate briefs, . . . appellants fail to show that the district court's determination" was erroneous. *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 173 (D.C. Cir. 2013).  The Pilots may not attempt to do so by incorporating argument presented in the district court, *see* Appellants' Br. 56 n.12, as this would circumvent the court's rules, *see* D.C. CIR. R. 32(a), regarding the length of briefs, where they fail, as here, to persuade the court that they could not have presented their challenge within the word limits for their briefs.  *See Gerlich*, 711 F.3d at 173.  According to the docket, the Pilots never sought an extension of the length of their opening brief.  We have no basis not to presume that the Pilots' counsel have briefed the claims determined to be most important and with the greatest chance of success on appeal.

Turning to the Pilots' five claims, the court need not resolve the parties' contentions regarding whether the PBGC is entitled to deference pursuant to *Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984), when it acts as the trustee in an involuntary retirement plan termination. Regardless of the standard of deference, the Pilots' claims relating to the PBGC's interpretation of the statute and regulations must fail. Similarly, the court need not decide the level of deference due to the PBGC's interpretation of Plan provisions because the Pilots have not demonstrated Article III standing for part of one claim and their other claims fail regardless of the standard. For these reasons we also need not decide whether the decision in *Davis v. PBGC*, 571 F.3d 1288, regarding the Pilots' request for a preliminary injunction, is the law of the case on the standard of review, *see Sherley v. Sebelius*, 689 F.3d 776, 783 (D.C. Cir. 2012).

**Claim One** concerns whether the benefit increase under U.S. Airways' Early Retirement Incentive Program ("ERIP") should be placed in priority category three. This designation is significant because the PBGC has determined that the Plan's assets cover all Plan benefits through priority category three. The ERIP was adopted on December 4, 1997, had an "effective date" of January 1, 1998, and allowed pilots on a seniority list who would turn forty-five on or before May 1, 2000 to elect to receive the benefit between March 1, 1998 and April 30, 1998. Those who elected to receive the benefit could not receive it before May 1, 1998, less than five years prior to the Plan's date of termination.

The Board determined that because the earliest date the benefit could be paid was one month after the beginning of the five-year period preceding the date of Plan termination, the ERIP benefit could not be included in priority category three. This is because during that one month period, those pilots who

had elected the benefit received a lesser benefit, and 29 C.F.R. § 4044.13(b)(3)(i) provides that benefits in priority category three are limited to "the lesser of the lowest annuity benefit in pay status during the 3-year period ending on the termination date and the lowest annuity benefit payable under the plan provisions at any time during the 5-year period ending on the termination date." According to the Board, the lesser amount was the amount payable during the first month of the five-year period preceding termination. So understood, it would be improper to place the ERIP benefits in priority category three.

The Pilots contend that the regulation on which the Board relied, 29 C.F.R. § 4044.13(b)(3)(i), imposes a cap "on the *overall amount* of [priority category three] benefits" and is not relevant. Appellants' Br. 36. Instead, they maintain that the relevant regulation is § 4044.13(b)(2), which refers to an effective date while § 4044.13(b)(3)(i) refers to a date when the benefit was payable. According to the Pilots, the effective date was January 1, 1998, before the five-year period prior to the Plan termination date. Under this interpretation, the court should conclude the ERIP benefit is in priority category three because there would be no lesser benefit under the Plan provisions in effect during the first month of the five-year period preceding termination; the ERIP benefit would have been in place throughout that period.

The PBGC concluded that the relevant regulation interpreting the phrase "in effect" in 29 U.S.C. § 1344(a)(3)(A) is 29 C.F.R. § 4044.13(b)(3)(i). This choice is the better interpretation of the regulatory scheme and there is no question that the court defers to the regulation's interpretation of the statute because the regulation was issued in the PBCG's role as an agency (and not as a fiduciary), *see PBGC v. LTV Corp.*, 496 U.S. 638, 648 (1990). The statutory phrase "in effect" in § 1344(a)(3)(A) is ambiguous, and the PBGC has interpreted it

in 29 C.F.R. § 4044.13(b)(3)(i) to mean "payable." The Pilots erroneously suggest such an interpretation erases the distinction in 29 U.S.C. § 1344(a)(3)(A) between the benefits "in pay status" and those "provisions . . . in effect." Section § 4044.13(b)(3)(i) retains the distinction by referring to benefits that were in "pay status" and those that were "payable." As the PBGC explains, there is no inconsistency between the regulations in § 4044.13(b)(3)(i), interpreting "in effect" in 29 U.S.C. § 1344(a)(3)(A) to mean "payable," and § 4044.13(b)(6), which interprets "in effect" in 29 U.S.C. § 1344(a)(3)(A) as "the later of the date on which [a plan or amendment] is adopted or the date it becomes effective": a plan amendment could have, for example, an adoption date of March 25, 1998, a date when payments begin to be made of May 1, 1998, and an effective date of January 1, 1998 (i.e., a retroactive payment date). Under this scenario, the benefit would be "payable" as of the effective date (January 1, 1998) but would not be "paid" until May 1, 1998. The "in effect" date would therefore be March 25, 1998, the later of the January 1, 1998 effective date and the March 25, 1998 adoption date.

**Claim Two** relates to § 7 of the Plan, which caps maximum yearly retirement income by incorporating the annual benefit limit in the Internal Revenue Code, 26 U.S.C. § 415(b). This provision was adopted well before the five-year period prior to Plan termination. Subsection (d) of § 415, however, allows for COLAs to increase the limits set in § 415(b). The Appeals Board determined that only COLAs that came into effect during the fourth and fifth years prior to Plan termination should be included in priority category three. The Board reasoned that incorporation of the § 415(b) limits into the Plan effectively made those limits provisions of the Plan. A default rule — priority category three includes the "lesser of the lowest annuity benefit in pay status during the 3-year period ending on the termination date and the lowest annuity benefit payable under

the plan provisions at any time during the 5-year period ending on the termination date," 29 C.F.R. § 4044.13(b)(3)(i) — includes an exception for automatic benefit increases "effective on or before the first day of the 5-year period ending on the termination date," *id*. § 4044.13(b)(5). If plan provisions providing for such "automatic increases in the benefit formula for both active participants and those in pay status or for participants in pay status only" are adopted and effective before the five-year period, then "automatic increases scheduled during the fourth and fifth years preceding termination" are also included in priority category three. *Id*. § 4044.13(b)(5). The Board included scheduled COLA increases during the fourth and fifth years prior to Plan termination in priority category three, but not those during the following three years.

The Pilots contend that the Appeals Board's conclusion conflicts with 29 U.S.C. § 1344(a)(3), which, they maintain, refers "to the '*provisions*' 'in effect' during the five-year pre-termination period . . . not [to] whether a particular 'benefit increase' was payable five years before plan termination." Appellants' Br. 38. Because § 7 of the Plan incorporated the § 415(b) limits and the § 415(d) COLAs before the five-year period, the Pilots maintain, the "provision" was "in effect" prior to the five-year period, and the increases that become effective within the five-year period as a result of that provision should all be included in priority category three. They further maintain that the automatic benefit increase regulation, 29 C.F.R. § 4044.13(b)(5), cannot "save the PBGC's position," because the COLAs are not benefit increase provisions but increases in a benefit limitation. Appellants' Br. 38.

The PBGC's analysis tracks the statute. As it explains, the incorporation of the COLAs in § 7.2 of the Plan makes them benefit increases. The "lowest annuity" rule, 29 U.S.C. § 1344(a)(3); 29 C.F.R. § 4044.13(b)(3)(i), favors the PBGC's

view because the COLAs were not payable throughout the five-year period prior to Plan termination. Under PBGC regulations, 29 C.F.R. § 4044.13(b)(3)(i), priority category three includes the "lesser of the lowest annuity benefit in pay status during the 3-year period ending on the termination date and the lowest annuity benefit payable under the plan provisions at any time during the 5-year period ending on the termination date." Because the COLAs were not "payable" until after the five-year period began, a lesser annuity benefit was payable during that time period, and it is that lesser benefit that should be included in priority category three. The Board's is the better interpretation of the statute.

**Claim Seven** involves the calculation of benefits for pilots who could have retired three years before Plan termination but did not. *See* 29 U.S.C. § 1344(a)(3)(B). The Pilots maintain that their benefits should not have been fixed as of the date they could have taken retirement but instead should be increased under principles of "actuarial equivalence" to compensate for the value they lost by not having their benefits commence earlier. The Appeals Board concluded that the statute and the relevant regulations do not allow for an adjustment but fix the benefit no later than the beginning of the three-year period before termination.

The Pilots rely primarily on a reference to "actuarial equivalen[ce]" elsewhere in ERISA, 29 U.S.C. § 1054(c)(3), which provides:

> For purposes of this section, in the case of any defined benefit plan, if an employee's accrued benefit is to be determined as an amount other than an annual benefit commencing at normal retirement age, or if the accrued benefit derived from contributions made by an employee is to be determined with respect to a benefit

> other than an annual benefit in the form of a single life annuity . . . commencing at normal retirement age, the employee's accrued benefit . . . shall be the actuarial equivalent of such benefit or amount determined under paragraph (1) or (2).

According to the Pilots, this means that the actuarial equivalent of the accrued benefit is nonforfeitable and belongs in priority category three. As support, however, they point to two inapposite cases, *Contilli v. Local 705 International Brotherhood of Teamsters Pension Fund*, 559 F.3d 720 (7th Cir. 2009), and *Stephens v. U.S. Airways Group, Inc.*, 644 F.3d 437 (D.C. Cir. 2011). Neither case addresses distress terminations, priority category three, or Title IV of ERISA. *Contilli*, 559 F.3d at 722, dealt with an employee whose retirement payments, which began several months after he retired, were not increased so that his pension would have the same value as if payments had begun at his retirement. *Stephens*, 644 F.3d at 438, dealt with a similar issue; plaintiffs opted to receive their pension benefits in a lump sum, but wanted interest on the sum in view of the forty-five-day delays from the dates they would have received the first annuity payments and the dates the plan disbursed their lump sum payments.

The Pilots fail to show that the PBGC has not adopted the better interpretation of 29 U.S.C. § 1344 (a)(3)(B), quoted *supra*. First, the ERISA provisions on which they rely are not relevant to priority category three determinations. The reference to actuarial equivalence in 29 U.S.C. § 1054(c)(3) relates more generally to benefit accrual requirements rather than which benefits fit into priority category three after a distress termination, and § 1054(c)(3) limits the actuarial equivalence requirement to the "purposes of this section." Second, the overt reference to an actuarial equivalence calculation in 29 U.S.C. § 1054(c)(3) undermines the Pilots' position because it

demonstrates that when Congress intended such a requirement it was explicit and it was not in the context of priority category three. Congress included references to actuarial equivalence elsewhere in ERISA, *see, e.g.*, 29 U.S.C. § 1054(c)(3). In contrast, § 1344(a)(3)(B) provides that the relevant benefit is that which "would have been in pay status" at the beginning of the three-year period preceding termination if the participant's benefits had commenced at that time. There is no mention of adjusting that benefit under principles of actuarial equivalence. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (internal quotation omitted). Finally, the PBGC regulations cited by the Appeals Board that interpret § 1344(a)(3)(B) are consistent with this instruction. Neither § 4044.13(b)(2)(ii) nor § 4044.13(b)(3)(ii) of PBGC's regulations provides for actuarial equivalence. Rather the phrase "*as if the benefit had commenced at that time*" in 29 C.F.R. § 4044.13(b)(2)(ii) (emphasis added) fixes the benefit at the beginning of the three-year period preceding plan termination — i.e., actuarial equivalence adjustments are not permitted.

**Claim Eight** involves a dispute over § 4.1(E) of the Plan, which the Pilots refer to as the "minimum benefit provision." This provision sets a minimum retirement income for pilots who were on a seniority list under the pre-December 1, 1972 plan (the "Prior Plan") based on benefits they would have received had that plan continued in effect without change. The Pilots contend that the plain meaning of § 4.1(E) confirms that all Prior Plan benefits should be included in the minimum benefit calculation, while the PBGC determined that some should and others should not.

First, the Pilots' objection that the district court erred in not considering additional documents is of no moment inasmuch as the court's review is *de novo* and the decisions under review are those of the PBGC Appeals Board. The Pilots fail to show that the Board abused its discretion in refusing to consider evidence that was not submitted to it. The evidence relates to a lawsuit, *Everett v. USAir Group, Inc*., 927 F. Supp. 478 (D.D.C. 1996), *aff'd sub nom. Everett v. U.S. Airways Group, Inc.*, 194 F.3d 173 (D.C. Cir. 1999), regarding the minimum benefit provision. In the consolidated appeal before the PBGC Appeals Board, the Pilots submitted some documents from the *Everett* litigation and implicitly offered to submit more at an evidentiary hearing, but the Board declined to hold a hearing. The Pilots blame the Board for not accepting the additional evidence they offered to submit at a hearing if the Board was inclined to rule against them. The Pilots also introduced in the district court a declaration from Seth Schofield, a former U.S. Airways CEO and witness to the 1972 Plan negotiations. The Pilots claim that they obtained the Schofield declaration only after the Board issued its decision, in response to the Board's reference to an absence of documentation from U.S. Airways employees who negotiated the minimum benefit provision.

The Pilots' first point barely merits consideration. If the Pilots wanted the Board to consider the additional documents they should have submitted them. The documents in the *Everett* case and their relevance were known to the Pilots. The Pilots were represented by counsel throughout the Board proceedings. As to the timing of the Schofield declaration, the Pilots rely on *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989), which allows parties to supplement the administrative record "where evidence arising after the agency action shows whether the decision was correct or not." But, as the district court noted, *see Davis*, 815 F. Supp. 2d at 291, the Schofield declaration did not arise after the Board's decision. The Pilots informed the Board

that they had declarations from all the U.S. Airways negotiators who recalled the bargaining over the minimum benefit provision. Even if they did not have a version of the Schofield declaration at the time of the appeal, they knew that declarations of this type would be relevant and they offer no reason why they could not have obtained the Schofield declaration in time to submit it with their appeal to the Board. Hence, it is properly disregarded by this court. As the district court observed in denying the Pilots' request that *it* consider documents that were not part of the administrative record before the Appeals Board:

> [F]or whatever reason, [the Pilots] did not provide all of the evidence supporting their position with their appeal. The Board . . . chose to act on the evidence before it and not to hold a hearing. The Board did not contravene any regulations by doing so. [The Pilots] may have been legitimately surprised by the Board's course of action, but [the Pilots'] own choice to withhold evidence at the agency level — whether tactical, labor-saving, or otherwise — does not provide a basis to allow the introduction of extra-record evidence during judicial review.

*Davis v. PBGC*, 815 F. Supp. 2d at 292. The Pilots criticize the Board for concluding that the additional evidence "*could not possibly* make a difference," Reply Br. 20 (emphasis in original), but the Board's conclusion was more nuanced, explaining that the statements in the affidavit provided to it, and any similar statements in additional affidavits, were insufficient to establish the Pilots' claims because they conflicted with the provisions of the Plan.

The Pilots' attempt to rely on the administrative record in the Jerome Peterman case is unavailing. They appear to attempt to make an end run around the district court's September 30,

2011, ruling declining to supplement the record, *Davis*, 815 F. Supp. 2d at 292. In any event, Peterman was listed as one of the plaintiffs although the Board did not resolve his appeal until May 9, 2012, twenty-one days before the district court granted summary judgment to the PBGC and more than six months after the district court declined to supplement the record. It is unclear whether Peterman was ever properly a plaintiff given that the Board decision in his case was never under review.

In addressing the Pilots' four Claim Eight arguments, we therefore look to the Plan and confine our review to the evidence in the administrative record. The Pilots offer the barest of arguments based on the text of the Plan, arguing only that "as a matter of common sense and sound linguistic construction, a Plan provision that promises a benefit 'no less' than the benefit provided by the Prior Plan necessarily includes *everything* that was included in the Prior Plan and does not need to specifically delineate each component." Appellants' Br. 51. The PBGC maintains that other language in the Plan reveals that the Plan was not to continue exactly as before.

*Reinvested dividends*. The Prior Plan included a variable component based on the performance of a group of stocks held by the Prior Plan. The valuation of these stocks included dividends. The new Plan, which did not include this variable component, provided that for purposes of "determining the retirement income to which the Participant would have been entitled" under the Prior Plan, the calculation should assume that if the variable component had survived, its performance would have been "equal to the investment performance of the Standard and Poor's 500 stock index (unadjusted for dividends)." The Pilots' position would require the court to ignore this phrase and include dividends in the minimum benefit calculation. To ignore the plain text would clearly be improper, particularly

because it appears in the same sentence that preserves the minimum benefits of the pre-1972 plan.

*Twice-yearly adjustments*. The Pilots maintain that Prior Plan pilots are entitled to twice-yearly adjustments incorporated in the pre-1972 plan to reflect changes in the value of the variable component of that plan. The PBGC determined that the new Plan fixed the minimum benefit amount at a Prior Plan pilot's benefit commencement date or termination of employment. The minimum benefit provision of the new Plan does not mention twice-yearly adjustments, but instead states that a Prior Plan pilot's retirement income "shall not be less than the amount to which he would have been entitled at his Benefit Commencement date or Termination of Employment had the Plan continued in effect." Although "amount to which he would have been entitled" could mean the amount at the time of retirement plus future adjustments, the Plan's text indicates a fixed amount was intended, stating that the relevant figure is the amount to which one was entitled at a particular moment in time. This limitation appears in the same sentence as text preserving the Prior Plan pilots' minimum benefits and is a qualification of that statement.

*1% termination credit*. The Pilots maintain that they are entitled to an "upward adjustment to account for forfeitures to the Plan caused by the termination of service of unvested participants." Second Am. Cmplt. at 185, *Davis v. PBGC*, 864 F. Supp. 2d 148 (D.D.C. 2012) (No. 1:08-cv-1064). The Appeals Board found this "1% termination credit," as the Pilots call it, nowhere appeared in the new Plan, was never applied by the airlines after the new Plan took effect, and, most significantly, was not necessary because the new Plan eliminated the possibility of the type of forfeiture that had given rise to the need for the credit. The Pilots do not contest the finding that the airlines had never applied this credit, and

accordingly the PBGC does not run afoul of Section 4.1(E)'s requirement that Plan benefits for qualified Pilots "not be less than the amount to which [they] would have been entitled . . . had the [Prior] Plan continued in effect without change." Indeed, under the new Plan, there is no need to allocate forfeited benefits and therefore no need to award the Prior Plan's 1% termination credit.

*50% income supplement for totally and permanently disabled pilots*.  Here, the Pilots maintain that the PBGC has failed to provide those qualified participants in the pre-1972 plan who became "'totally and permanently' disabled" with the Prior Plan's "50% retirement income supplement."  The Appeals Board found that the new Plan explicitly set forth two formulae for assessing benefits for individuals who were totally and permanently disabled – one for those who began receiving disability benefits on or after December 1, 1974 and one for those who began receiving disability benefits prior to December 1, 1974.

The court does not address this part of Claim Eight because the Pilots have failed to demonstrate Article III standing by showing at least one of them was on the relevant seniority list as of December 1, 1972, and had become totally and permanently disabled within two years after retiring due to a related disability.  *See* Plan § 4.1(E); Prior Plan § 4.  In a supplemental brief the Pilots stated that "[a]t least four such Appellants" were "entitled to the 50% disability retirement supplement," and identified the four by name, but failed to identify the relevant criteria, both eliding the difference between "normal" and "disability" retirement and failing to state that the total and permanent disability must be related to the earlier disability.  *See* Appellants' Supp. Br. 3 (Sept. 19, 2013); *see id.* 2.  Given the misstatement of the criteria, the Pilots' identification of "four such [Pilots]" fails to show any Pilot suffered an injury in fact

as a result of the PBGC's determination on the 50% supplement. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). The exhibit to which the Pilots point on the question of whether the Pilots' disabilities entitled them to the 50% supplement at issue is unhelpful because it lists only the names of "Disability Pilots" without indicating whether these Pilots' disabilities meet the Prior Plan's criteria. *See* Appellants' Supp. Br. 3 (citing Ex. 3 to Decl. of Ronald B. Natalie). In any event, the PBGC responded that the four identified Pilots could not benefit from a favorable ruling on this part of Claim Eight because their current benefits are equal to the Internal Revenue Code § 415(b) cap at issue in Claim Two. *See* Appellee's Response to Appellants' Supp. Br. 2-4. The Pilots acknowledged in their supplemental brief that avoidance of the § 415(b) cap depended on their prevailing on Claim Two, *see* Appellants' Supp. Br. 3, which they do not.

**Claim Eleven** involves the Board's September 11, 2008 decision concerning eligibility for and calculation of the Pilots' disability retirement benefits. The Plan's disability retirement provision in § 4.1(E) guarantees a minimum amount of basic retirement income to a pilot "who begins receiving disability benefits under the Additional Benefit Programs on or after December 1, 1974, *and* who is determined to be totally and permanently disabled" (emphasis added). The "Additional Benefit Programs" include the separately administered USAir, Inc. Pilot Disability Plan (the "Disability Plan").

The Pilots' position here rests upon their views of the procedures that must be in place to determine who is totally and permanently disabled, and the participants or beneficiaries who are covered by the disability provision in § 4.1(E). On procedures, the Pilots describe (without providing a record citation) a 1980 amendment to "the Plan" that fundamentally changed the way disability determinations were made.

According to the Pilots, these changes meant that pilots were no longer required to secure a formal Social Security Administration ("SSA") determination of total and permanent disability but instead could seek an initial determination of total and permanent disability from U.S. Airways and, if unsuccessful, a new determination from either a medical examiner or the U.S. Airways Retirement Board. Consequently, the Pilots conclude that the PBGC must provide a similar alternative mechanism for obtaining a determination of total and permanent disability.

The PBGC points out that the changes to which the Pilots refer are part of the Disability Plan, rather than the Retirement Income Plan. The Disability Plan, not the Retirement Plan, governs total and permanent disability determinations and it is ongoing and administered by U.S. Airways. *See* Appellee's Br. 56-57. The PBGC states that it is continuing U.S. Airways' long-established practice of deferring to the plan administrator of the Disability Plan for disability determinations. *See id.* 56. More significantly for our purposes, the PBGC states that the Pilots can demonstrate no legal basis for imposing obligations on the PBGC based on provisions of the Disability Plan because it administers only the Retirement Plan. In fact the Pilots fail to cite a legal basis on which the court could conclude that the PBGC was required to continue the pre-termination practice as part of its responsibilities in administering the Retirement Plan. Their assertion that "there is absolutely no evidence that the Disability Plan is resolving or would resolve disputes involving pre-termination disabilities," Reply Br. 25, lacks support in the record and in rebuttal oral argument they never challenged the statement by PBGC's counsel that before the Plan terminated, all disability determinations were made under the separate Disability Plan, which still exists today, *see* Oral Arg. at 53:02 (Sept. 10, 2013). By contrast, the PBGC's argument, including that the Pilots could have gone back to the Disability Plan to get

a determination, was met by the Pilots' rebuttal acknowledging that the Disability Plan still exists, but asserting that under prior practice it was a gatekeeper and after going to the Disability Plan pilots could go to the Retirement Board (which no longer exists) or to a medical examiner (which the PBGC does not allow). Therefore, they argued, their only option is an SSA determination. Still, this response does not explain why it should be up to the PBGC, rather than the Disability Plan administrator, to permit a medical examiner to find total and permanent disability, or why it is inappropriate for the PBGC to defer to the Disability Plan administrator on this question concerning interpretation of the Disability Plan.

With regard to the identification of which pilots are eligible for the basic retirement income guarantee, § 4.1(E) provides that it is available "to a Participant who begins receiving disability benefits under the Additional Benefit Programs on or after December 1, 1974, *and* who is determined to be totally and permanently disabled" (emphasis added). The PBGC reads this provision as a two part test: to qualify, the pilot must be determined to be totally and permanently disabled and at the time of retirement have received disability benefits under the Additional Benefit Programs. The Pilots disagree, maintaining the date makes the clause a timing requirement, indicating that the formulae directly following in the Plan apply to those who are totally and permanently disabled after December 1, 1974, not those who were totally and permanently disabled before that date. The Pilots provided no record citation to show that the PBGC's reading was inconsistent with other provisions of the Plan or with the history of the provision and so failed to show that the PBGC erred in relying on the Plan's plain text. The Pilots suggest that a requirement that a totally and permanently disabled pilot receive disability benefits before retiring is inconsistent with the text defining the retirement benefit as what the participant was "entitled to receive under the Additional

Benefits Programs," not what he was actually receiving. This phrase relates, however, to benefit calculation, rather than the antecedent eligibility question. In addition, the Pilots offer no interpretation of the word "and" in the provision that identifies which participants are eligible.

Accordingly, we affirm the judgment of the district court granting summary judgment to the PBGC on the five claims before this court.